**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MICHAEL KENT, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| WESCO AIRCRAFT HOLDINGS, INC., RANDY J. SNYDER, DAYNE A. BAIRD, THOMAS M. BANCROFT III, PAUL E. FULCHINO, JAY L. HABERLAND, SCOTT E. KUECHLE, ADAM J. PALMER, ROBERT D. PAULSON, JENNIFER M. POLLINO, TODD RENEHAN, and NORTON A. SCHWARTZ, | ) ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on August 9, 2019 (the "Proposed Transaction"), pursuant to which Wesco Aircraft Holdings, Inc. ("Wesco" or the "Company") will be acquired by Wolverine Intermediate Holding II Corporation ("Parent") and Wolverine Merger Corporation ("Merger Sub," and together with Parent, "Wolverine").  Parent and Merger Sub are indirect subsidiaries of funds managed and advised by Platinum Equity Advisors, LLC.

2.      On August 8, 2019, Wesco's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger

Agreement") with Wolverine.  Pursuant to the terms of the Merger Agreement, Wesco's stockholders will receive $11.05 in cash for each share of Wesco common stock they own.

3.      On September 13, 2019, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission (the "SEC") in connection with the Proposed Transaction, which scheduled a stockholder vote on the Proposed Transaction for October 24, 2019.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Wesco common stock.

9. Defendant Wesco is a Delaware corporation and maintains its principal executive offices at 24911 Avenue Stanford, Valencia, California 91355. Wesco's common stock is traded on the New York Stock Exchange under the ticker symbol "WAIR."

10. Defendant Randy J. Snyder is Chairman of the Board of the Company.

11. Defendant Dayne A. Baird is a director of the Company.

12. Defendant Thomas M. Bancroft III is a director of the Company.

13. Defendant Paul E. Fulchino is a director of the Company.

14. Defendant Jay L. Haberland is a director of the Company.

15. Defendant Scott E. Kuechle is a director of the Company.

16. Defendant Adam J. Palmer is a director of the Company.

17. Defendant Robert D. Paulson is a director of the Company.

18. Defendant Jennifer M. Pollino is a director of the Company.

19. Defendant Todd Renehan is a Chief Executive Officer and a director of the Company.

20. Defendant Norton A. Schwartz is a director of the Company.

21. The defendants identified in paragraphs 10 through 20 are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

22. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Wesco (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

23. This action is properly maintainable as a class action.

24.     The Class is so numerous that joinder of all members is impracticable.  As of August 7, 2019, there were approximately 99,749,063 shares of Wesco common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

25.     Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

26.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company and the Proposed Transaction*

29.     Wesco is one of the world's leading distributors and providers of comprehensive supply chain management services to the global aerospace industry.

30.     The Company's services range from traditional distribution to the management of supplier relationships, quality assurance, kitting, just-in-time delivery, chemical management services, third-party logistics or fourth-party logistics, and point-of-use inventory management.

31.     The Company believes it offers one of the world's broadest portfolios of aerospace products, including C-class hardware, chemicals and electronic components and comprised of more than 550,000 active SKUs.

32.     On August 8, 2019, Wesco's Board caused the Company to enter into the Merger Agreement with Wolverine.

33.     Pursuant to the terms of the Merger Agreement, Wesco's stockholders will receive $11.05 in cash for each share of Wesco common stock they own.

34.     According to the press release announcing the Proposed Transaction:

Wesco Aircraft Holdings Inc. (NYSE: WAIR), one of the world's leading distributors and providers of comprehensive supply chain management services to the global aerospace industry, today announced that it has entered into a definitive merger agreement to be acquired by an affiliate of Platinum Equity in a transaction valued at approximately $1.9 billion.

Upon closing, Wesco will be combined with Platinum Equity portfolio company Pattonair, a provider of supply chain management services for the aerospace and defense industries based in the United Kingdom.

Under the agreement, which has been unanimously approved by Wesco's Board of Directors, Wesco shareholders would receive $11.05 per share in cash. The cash purchase price represents a premium of approximately 27.5 percent to the 90-day volume weighted average share price for the period ended May 24, 2019, the last trading day prior to media speculation regarding a potential transaction involving Wesco Aircraft.

Wesco's three largest shareholders, affiliates of The Carlyle Group and Makaira Partners, as well as the Snyder Family Trusts, support the transaction and have entered into voting and support agreements to vote their shares in favor of the transaction. . . .

Transaction Details

The transaction will be financed through a combination of committed equity financing provided by affiliates of Platinum Equity Capital Partners IV, L.P., as well as debt financing that has been committed to by Bank of America Merrill Lynch.

The transaction is expected to be completed by the end of calendar 2019 and is subject to Wesco shareholder approval, regulatory clearances and other customary closing conditions.

Upon the completion of the transaction, Wesco will become a privately held company, and shares of its common stock no longer will be listed on any public market.

Advisors

Morgan Stanley & Co. LLC and J.P. Morgan Securities LLC are serving as financial advisors to Wesco, and Latham & Watkins LLP is providing legal counsel to Wesco. Hughes Hubbard & Reed LLP is providing M&A legal counsel to Pattonair, and Willkie Farr & Gallagher LLP is providing financing legal counsel to Pattonair.

35.     The Merger Agreement contains a "no solicitation" provision that prohibits the

Individual Defendants from soliciting alternative proposals and severely constrains their ability to

communicate and negotiate with potential buyers who wish to submit or have submitted

unsolicited alternative proposals.  Section 5.3(a) of the Merger Agreement provides:

Except as expressly permitted by this Section 5.3, from and after the date hereof, the Company shall, and shall cause its Subsidiaries and Representatives to, (w) promptly cease and cause to be terminated any activities, solicitations, discussions or negotiations with any Third Party that may be ongoing with respect to any Acquisition Proposal or any inquiry or proposal that constitutes or could reasonably be expected to lead to any Acquisition Proposal, (x) promptly request (and in event within twenty-four (24) hours) any such Third Party to promptly return or destroy all confidential information concerning the Company and its Subsidiaries, (y) promptly (and in any event within six (6) hours) terminate all access previously granted to such persons to any physical or electronic data room and (z) except to the extent that the Company Board (or a duly authorized committee thereof) determines in good faith, after consultation with outside counsel, that a failure to agree to a waiver or amendment would reasonably be expected to violate its fiduciary duties to the stockholders of the Company under applicable Law, enforce, and not waive or amend (as applicable), any provisions of any Anti-Takeover Law

or confidentiality or standstill agreement (or any similar agreement) to which the Company or any of its Subsidiaries is a party relating to any Acquisition Proposal or proposal that would reasonably be expected to lead to an Acquisition Proposal or otherwise cause the terms of such agreement to be less restrictive than an Acceptable Confidentiality Agreement.  Except as expressly permitted by this Section 5.3, from and after the date hereof until the receipt of the Company Stockholder Approval, or, if earlier, the termination of this Agreement in accordance with Article 7, the Company shall not, and shall cause its Subsidiaries and Representatives not to, directly or indirectly, (i) initiate, solicit, propose or knowingly facilitate, induce or encourage any inquiries with respect to, any effort or attempt to submit, or the submission of, any proposal or offer that constitutes or would reasonably be expected to lead to an Acquisition Proposal, including by way of furnishing any non-public information to any Third Party related to any potential Acquisition Proposal, or (ii) enter into, continue or otherwise participate or engage in any discussions or negotiations with respect thereto (other than informing any Third Party of the existence of the provisions contained in this Section 5.3), except that, the Company may ascertain facts from any Person making an Acquisition Proposal for the purpose of the Company Board clarifying the terms and conditions of such Acquisition Proposal and the Third Party making it in order to allow the Company Board to determine whether the Acquisition Proposal constitutes or would reasonably be expected to lead to a Superior Proposal, provided, that the foregoing shall not permit any negotiations or similar discussions with respect to such Acquisition Proposal or any verbal expression of the Company's view or position with respect thereto. Except as expressly permitted by this Section 5.3, from and after the date hereof until the receipt of the Company Stockholder Approval, or, if earlier, the termination of this Agreement in accordance with Article 7, neither the Company Board nor any committee thereof shall, directly or indirectly, (i) approve, adopt or recommend, or publicly propose to approve, adopt or recommend, any Acquisition Proposal, (ii) fail to make, withdraw, or qualify (or change, amend or modify in a manner adverse to Parent or Merger Sub) the Company Board Recommendation or the adoption or declaration of advisability of this Agreement, the Merger or any of the other Transactions by the Company Board, (iii) approve or recommend, or publicly propose to approve or recommend, or cause or allow the Company or any of its controlled affiliates to enter into any merger agreement, letter of intent, memorandum of understanding, agreement in principle, option agreement, joint venture agreement, partnership agreement or other similar agreement relating to any Acquisition Proposal, (iv) fail to include the Company Board Recommendation in the Proxy Statement, (v) other than with respect to a tender offer or exchange offer, fail to publicly reaffirm its recommendation of this Agreement within ten (10) Business Days after Parent so requests in writing if an Acquisition Proposal or any modification thereto shall have been made public or sent or given to the Company's stockholders (or any Person or group of Persons shall have publicly announced an intention, whether or not conditional, to make an Acquisition Proposal), (vi) fail to recommend, in a Solicitation/Recommendation Statement on Schedule 14D-9, against any Acquisition Proposal subject to Regulation 14D under the Exchange Act within ten

(10) Business Days after the commencement of such Acquisition Proposal, (vii) make any public statement inconsistent with the Company Board Recommendation or (viii) resolve or agree or announce its intention to resolve or agree to do any of the foregoing (any action set forth in the foregoing clauses (i) through (viii) of this sentence, a "Change of Board Recommendation"). Any breach by a Representative of the Company or any of its Subsidiaries of this Section 5.3 shall be deemed a breach hereof by the Company.

36.     Additionally, the Company must promptly advise Wolverine of any proposals or inquiries received from other parties.  Section 5.3(c) of the Merger Agreement states:

> From and after the date hereof, the Company shall promptly (and in any event within twenty-four (24) hours) notify Parent in writing in the event that the Company receives any (i) Acquisition Proposal, (ii) inquiry or request for information from, or for the initiation of discussions or negotiations with, the Company or its Representatives concerning, or that could reasonably be expected to lead to, an Acquisition Proposal, or (iii) request for non-public information relating to the Company or any of its Subsidiaries or for access to the business, properties, assets, books, or records of the Company or any of its Subsidiaries by any Third Party who has made or communicated to the Company that it intends to make an Acquisition Proposal.  The Company shall notify Parent promptly (and in any event within twenty-four (24) hours) of the identity of such Person and provide to Parent a copy of such Acquisition Proposal (or, where no such copy is available, a reasonable description of the material terms and conditions of such Acquisition Proposal, inquiry or request).  Without limiting the foregoing, the Company shall promptly (and in any event within twenty-four (24) hours after such determination) advise Parent if the Company determines to begin providing information or to engage in discussions or negotiations concerning an Acquisition Proposal pursuant to Section 5.3(b).  In addition, the Company shall keep Parent reasonably informed on a current basis (and in any event within twenty-four (24) hours) of any material changes to the status and any changes to material terms of any such Acquisition Proposal, inquiries or requests (and true and complete copies of any amended or modified written Acquisition Proposal, inquiry or request, including modified written proposed agreements), including any change in the Company's intentions as previously notified.

37.     Moreover, the Merger Agreement contains a "fiduciary out" provision permitting the Board to change its recommendation of the Proposed Transaction under extremely limited circumstances, and grants Wolverine a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 5.3(d) of the Merger Agreement provides:

Notwithstanding anything to the contrary contained in Section 5.3(a), if (x) the Company has received a written Acquisition Proposal that has not been withdrawn and that the Company Board (or any duly authorized committee thereof) determines in good faith, after consultation with its independent financial advisors and outside counsel, constitutes (and continues to constitute) a Superior Proposal and (y) the Company Board determines in good faith, after consultation with its outside counsel, that failure to take such action in response to such Superior Proposal would violate the directors' fiduciary duties to the stockholders of the Company under applicable Law, the Company Board may at any time prior to the receipt of the Company Stockholder Approval, (A) effect a Change of Board Recommendation with respect to such Superior Proposal and/or (B) terminate this Agreement pursuant to Section 7.1(d) in order to enter into a definitive written agreement with respect to such Superior Proposal, in either case subject to the requirements of this Section 5.3(d); provided, that the Company shall not be entitled to effect a Change of Board Recommendation pursuant to this Section 5.3(d) or terminate this Agreement pursuant to Section 7.1(d) unless all of the following conditions are met:

(i) the Company shall have provided to Parent at least four days' prior written notice (the "Notice Period") of the Company's intention to effect a Change of Board Recommendation or to terminate this Agreement pursuant to Section 7.1(d), which notice shall specify in reasonable detail the material terms and conditions of such Superior Proposal and the identity of the Person or group of Persons making such Superior Proposal and the Company Board's reasons for intending to effect a Change of Board Recommendation or to terminate this Agreement pursuant to Section 7.1(d) and shall have provided to Parent a copy of the latest draft of the proposed transaction agreement to be entered into in respect of such Superior Proposal and all other material proposed transaction documents (if any) relating to such Superior Proposal;

(ii) during the Notice Period, if requested by Parent, the Company shall have, and shall have caused its Representatives and legal and financial advisors to have, engaged in good faith negotiations with Parent regarding any amendment to this Agreement proposed in writing by Parent and intended to cause the relevant Superior Proposal to no longer constitute a Superior Proposal;

(iii) the Company Board shall have considered in good faith any adjustments and/or amendments that Parent, in its sole discretion, shall have proposed with respect to this Agreement (including a change to the price terms hereof) and the other agreements contemplated hereby that may be irrevocably offered in writing by Parent (the "Proposed Changed Terms") no later than 11:59 a.m., New York City time, on the last day of the Notice Period and shall have determined in good faith, after consultation with its independent financial advisor and outside counsel, that such Proposed Changed Terms would continue to render the failure by the Company Board to make such Change of Board Recommendation a violation of its fiduciary duties to the stockholders of the Company under applicable Law or that the Superior Proposal would continue to constitute a Superior Proposal if such

Proposed Changed Terms were to be given effect (it being understood and agreed that in the event that the Company Board shall have determined in good faith, after consultation with its independent financial advisor and outside counsel, that such Proposed Changed Terms would render the failure by the Company Board to make such Change of Board Recommendation no longer a violation of its fiduciary duties under applicable Law or would render such Superior Proposal no longer a Superior Proposal, the Company shall agree in writing to all Proposed Changed Terms and the Company's notice of the proposed Change of Board Recommendation or the termination of this Agreement shall be deemed to be rescinded and of no further force and effect);

(iv) the Company shall have complied with its obligations under this Section 5.3 (other than de minimis non-compliance) with respect to such Superior Proposal; and

(v) prior to or concurrently with any termination of this Agreement, the Company shall have paid the Company Termination Fee to Parent.

In the event of any substantive revisions to such Superior Proposal offered in writing by the party making such Superior Proposal, the Company shall be required to deliver a new written notice to Parent within 24 hours and to again comply with the requirements of this Section 5.3(d) with respect to such new written notice, except that the Notice Period shall be reduced to three (3) Business Days with respect to any such revised Superior Proposal.

38.     The Merger Agreement also provides for a "termination fee" of $39 million payable by the Company to Wolverine if the Individual Defendants cause the Company to terminate the Merger Agreement.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

39.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction, which scheduled a stockholder vote on the Proposed Transaction for October 24, 2019.

40.     As set forth below, the Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

41.     First, the Proxy Statement omits material information regarding the Company's financial projections.

42.     The Proxy Statement fails to disclose, for each set of projections: (i) all line items used to calculate (a) adjusted net income, (b) adjusted EBITDA, (c) free cash flow, and (d) unlevered free cash flow; and (ii) a reconciliation of all non-GAAP to GAAP metrics.

43.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

44.     Second, the Proxy Statement omits material information regarding the analyses performed by the Company's financial advisors in connection with the Proposed Transaction, Morgan Stanley & Co. LLC ("MS") and J.P. Morgan Securities LLC ("JPM").

45.     With respect to MS's Discounted Cash Flow Analysis, the Proxy Statement fails to disclose: (i) all line items used to calculate unlevered free cash flow; (ii) the value of the tax benefit from the amortization of intangible assets for the life of such assets; (iii) the individual inputs and assumptions underlying the discount rates ranging from 6.9% to 8.4% and the perpetual growth rate of 1.5%; (iv) the terminal values of the Company; and (v) the outstanding shares of Wesco common stock on a fully diluted basis.

46.     With respect to MS's Hypothetical Leveraged Buyout Analysis, the Proxy Statement fails to disclose MS's basis for selecting the leverage multiple, financing terms, exit multiple, target internal rate of return, and transaction expenses used in the analysis.

47.     With respect to JPM's Discounted Cash Flow Analysis, the Proxy Statement fails to disclose: (i) all line items used to calculate unlevered free cash flow; (ii) the value of the tax benefit from the amortization of certain intangible assets for the life of such assets; (iii) the terminal values of the Company; and (iv) the individual inputs and assumptions underlying the range of

discount rates from 8.25% to 9.25% and the perpetual growth rate ranging from 1.0% to 2.0%.

48.     With respect to JPM's Analyst Price Target analysis, the Proxy Statement fails to disclose: (i) the price targets observed by JPM in the analysis; and (ii) the sources thereof.

49.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

50.     Third, the Proxy Statement omits material information regarding potential conflicts of interest of MS and JPM.

51.     The Proxy Statement fails to disclose the timing and nature of the past services MS provided to the Company, Platinum, and their affiliates.

52.     The Proxy Statement fails to disclose the timing and nature of the past services JPM provided to the Company and its affiliates.

53.     The Proxy Statement fails to disclose the amount of compensation JPM received for the past services it provided to The Carlyle Group, L.P. and its affiliates.

54.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

55.     Fourth, the Registration Statement fails to disclose whether the Company entered into any non-disclosure agreements that contained "don't ask, don't waive" provisions that are or were preventing other potential acquirors from requesting waivers of standstill provisions to submit offers to acquire the Company.

56.     Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are or were

permitted to do so, when in fact they are or were contractually prohibited from doing so.

57.     The omission of the above-referenced material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) Background of the Merger; (ii) Recommendation of Our Board of Directors and Reasons for the Merger; (iii) Fairness Opinion of Morgan Stanley & Co. LLC; (iv) Fairness Opinion of J.P. Morgan Securities LLC; and (v) Certain Financial Projections.

58.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Wesco

59.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

60.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Wesco is liable as the issuer of these statements.

61.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

62.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

63.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on

the Proposed Transaction.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

64.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

65.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

66.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

67.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of Wesco within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Wesco and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

69.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

70.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of the Proxy Statement.

71.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

72.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: September 17, 2019

**RIGRODSKY & LONG, P.A.**

By:     */s/ Gina M. Serra*
        Brian D. Long (#4347)
        Gina M. Serra (#5387)

**OF COUNSEL:**         300 Delaware Avenue, Suite 1220
                        Wilmington, DE 19801
**RM LAW, P.C.**        Telephone: (302) 295-5310
Richard A. Maniskas     Facsimile: (302) 654-7530
1055 Westlakes Drive, Suite 300     Email: bdl@rl-legal.com
Berwyn, PA 19312        Email: gms@rl-legal.com
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
Email: rm@maniskas.com  *Attorneys for Plaintiff*